1999 UT App 239
**Ann Elizabeth THOMAS, Plaintiff, Appellant, and Cross appellee,**
v.
**Bert Charles THOMAS, Defendant, Appellee, and Cross**

**appellant.**
**No. 971472–CA.**

Court of Appeals of Utah.

Aug. 12, 1999.

Frederick N. Green, Green & Berry, Salt Lake City, for Appellant.

Brent D. Young, Ivie & Young, Provo, for Appellee.

Before WILKINS, P.J., and DAVIS, and ORME, JJ.

## AMENDED OPINION [1]

ORME, Judge:

¶ 1 Ann Thomas appeals the trial court's decree of divorce, challenging the court's award of custody and alimony, as well as its property division. Bert Thomas cross-appeals, arguing the trial court over-estimated his annual income. We affirm.

## BACKGROUND

¶ 2 Ann Thomas and Bert Thomas were divorced, thus ending their almost fifteen-year marriage, on July 9, 1997. During their marriage, they had two children, now ages twelve and nine. Ms. Thomas is a teacher in the same school the children attend. Mr. Thomas owns Bert Thomas Construction, Inc. and works primarily in the Sundance resort area in Utah County. Other facts will be discussed in the course of considering the parties' arguments.

## CUSTODY

¶ 3 We first address Ms. Thomas's challenge of the trial court's award to Mr. Thomas of custody of the parties' two children. "[W]e accord broad discretion to the trial court so that it may use its first-hand proximity to the parties to resolve the delicate and highly personal problems presented in custody disputes." *Erwin v. Erwin*, 773 P.2d 847, 849 (Utah Ct.App.1989). We will overturn the court's findings of fact only if they are clearly erroneous, and " '[o]nly where the trial court's judgment is so flagrantly unjust as to be an abuse of discretion, will [an appellate court] interpose its own judgment.' " *Tucker v. Tucker*, 910 P.2d 1209, 1214 (Utah 1996) (citation omitted; second alteration in original). However, " '[t]o ensure the court acted within its broad discretion, the facts and reasons for the court's decision must be set forth fully in

appropriate findings and conclusions.' " *Roberts v. Roberts*, 835 P.2d 193, 195 (Utah Ct.App.1992) (quoting *Painter v. Painter*, 752 P.2d 907, 909 (Utah Ct.App.1988)).

¶ 4 Ms. Thomas's concerns focus on the trial court's findings and conclusions concerning her relationship with Pedro Sauer. Shortly before the parties separated in March 1993, Ms. Thomas began a relationship with Mr. Sauer, her instructor in "Brazilian jiu jitsu." [2] Mr. Sauer was also married at the time. The trial court found that, during his relationship with Ms. Thomas, Mr. Sauer had been charged with domestic violence against his wife and, after an incident that occurred in Ms. Thomas's presence, with illegal possession of a firearm. The court further found that Mr. Sauer had a history of extramarital affairs and had fathered a child with his wife while continuing his relationship with Ms. Thomas. The court observed that "[t]he appearance of Señor Pedro Sauer in an emotional and sexual relationship with Ann Thomas during this marriage is a very complicating factor." The court found that Ms. Thomas had "been the primary care giver for the children throughout their lives," and that, "[a]bsent [Mr. Sauer's] entry, and his influence, it is clearly in the best interests of the children to be awarded to Ann Thomas." However, the court determined that, "[w]ith Pedro in the picture, which he is and intends to be, it is not in the best interests of the children to be in the home and subjected to the negative influence and example of Pedro."

¶ 5 Ms. Thomas argues, first, that the trial court placed too much weight on her moral conduct, while failing to properly weigh the best interests of the children. Second, Ms. Thomas argues the trial court failed to show how her relationship with Mr. Sauer negatively affected her parenting abilities or the best interests of the children. [3]

---

1. This Amended Opinion replaces the Opinion in Case No. 971472–CA issued on July 29, 1999.

2. The record does not reveal what distinguishes "Brazilian jiu jitsu" from other martial arts. We assume it is a variation of jujitsu, a "Japanese art of self-defense without weapons that depends for its efficiency largely upon the principle of making use of an opponent's strength and weight to

disable or injure him." *Webster's Third New International Dictionary* 1224 (1976).

3. Ms. Thomas also claims that "key factual findings regarding Mr. Sauer's past behavior" are unsupported by the evidence. "[I]n order to challenge a trial court's findings of fact on appeal, the challenger 'must marshal *all* the evidence in support of the findings and then demon-

¶ 6 Utah Code Ann. § 30–3–10(1) (1998) directs that, "[i]n determining custody, the court shall consider the best interests of the child and the past conduct and demonstrated moral standards of each of the parties." Ms. Thomas argues the trial court improperly placed more emphasis on her moral character than on the children's best interests when it allowed her relationship with Mr. Sauer to overcome its own finding that it would *clearly* be in the children's best interests to be in Ms. Thomas's custody.

¶ 7 Ms. Thomas correctly states that "a custodial parent's censurable extramarital sexual activities do not in and of themselves make him or her an unfit and improper person to have custody." *Tucker v. Tucker,* 881 P.2d 948, 954 (Utah Ct.App. 1994), *rev'd on other grounds,* 910 P.2d 1209 (Utah 1996). It is likewise true that, "[i]n considering competing claims to custody between fit parents under the 'best interests of the child' standard, considerable weight should be given to which parent has been the child's primary caregiver." *Davis v. Davis,* 749 P.2d 647, 648 (Utah 1988). However, Ms. Thomas makes too much of the trial court's use of the word "clearly." The trial court's findings, when viewed as a whole, establish the required causal connection between Ms. Thomas's relationship with Mr. Sauer and her parental fitness. *See Shioji v. Shioji,* 712 P.2d 197, 200 (Utah 1985) (holding that, in order to justify change in custody, extramarital sexual relationship must "have some material relationship to and substantial effect on parenting ability.").

¶ 8 The trial court found this case "complicated[,] ... with no easy, clear-cut answers," and stated that "[b]oth ... parents ... are competent and definitely love their children." As the primary caregiver, Ms. Thomas would have received custody of the children were it not for the negative impact of her relationship with Mr. Sauer, which " 'had a dramatic effect' on the ultimate breakup of the Thomas family." And although the evaluators advising the court did not find the relationship was harmful to the children, the court found "a 'link' or connection that would suggest that the relationship between [Ms. Thomas] and Mr. Sauer has negatively impacted the children, or will negatively impact the children in the future."

¶ 9 Specifically, Mr. Sauer's domestic violence and gun charges caused the court concern for Ms. Thomas's safety and for the negative influence on the children of any future illegal activity on his part. More tangibly, the court was concerned that although Mr. Sauer offered no financial assistance, "scarce resources [were] expended on [him by Ms. Thomas] for gifts and travel." Further, the court noted that the children had witnessed a confrontation between Mr. Sauer and his wife at Ms. Thomas's home. The court was "profoundly concerned" that Ms. Thomas seemed unable to appreciate that aspects of her relationship with Mr. Sauer were unhealthy for the children. The court took particular exception to Ms. Thomas's opinion of Mr. Sauer as " 'a very positive role model.' " The court concluded: "To that extent [Ms.] Thomas does not have the best interests of the children at heart.... Mr. Thomas offers a more stable environment to the children."

¶ 10 The issues raised by Ms. Thomas on this point were addressed by the Utah Supreme Court in *Shioji v. Shioji,* 712 P.2d 197 (Utah 1985). In that case, an extramarital relationship was the impetus behind a noncustodial parent's petition to modify custody. The trial court had found that the mother's "conduct and attitude with respect to the relationship had a material and adverse effect on her parenting ability," and that the mother and her boyfriend "were either unwilling or unable to appreciate the adverse impact of their conduct on the children." *Id.* at 200. Our Supreme Court ruled that, while

a custodial parent's extramarital sexual relationship alone is insufficient to justify a

strate that the evidence is insufficient to support the findings in question.' " *Marshall v. Marshall,* 915 P.2d 508, 516 (Utah Ct.App.1996) (quoting *Phillips v. Hatfield,* 904 P.2d 1108, 1109 n. 1 (Utah Ct.App.1995)) (emphasis in original). We agree with Mr. Thomas that, on this issue, Ms.

Thomas has failed to marshal the evidence in support of the findings she challenges, and instead has merely argued facts she believes show the challenged findings are incorrect. We therefore decline to disturb the trial court's findings regarding Mr. Sauer's past behavior.

change in custody[, t]he trial court's findings in this case go far beyond a single finding that [the mother] engaged in extramarital intercourse or that she, on occasion, allowed her boyfriend to stay overnight. The key to our decision is the court's finding of a substantial adverse impact on the children as a result of the [mother's] behavior.

*Id.* at 200–01 (footnote omitted).

¶ 11 The divorce proceedings in this case were of several days' duration. The court heard live testimony and observed the demeanor of the witnesses. We defer to the trial court's assessments of credibility and—perhaps more importantly in this case—demeanor. *See D'Aston v. Aston,* 844 P.2d 345, 355 (Utah Ct.App.1992). Moreover, the trial court's detailed findings show that the best interests of the children were the trial court's primary concern. This is not a case, as Ms. Thomas argues, in which the custody award was based solely on Ms. Thomas's marital infidelity or on Mr. Sauer's character. Taken as a whole, the trial court's findings support its conclusion that Ms. Thomas's relationship with Mr. Sauer negatively affected her parenting ability and was contrary to the children's best interests, thus tipping the balance in this close case in Mr. Thomas's favor notwithstanding that the court viewed Ms. Thomas as a competent, loving parent and granted her liberal visitation. Accordingly, the court did not abuse its discretion in awarding custody of the children to Mr. Thomas.

## ALIMONY

¶ 12 We turn next to Ms. Thomas's challenge to the trial court's award of alimony. "Trial courts have broad discretion in making alimony awards. Therefore, we will not disturb a trial court's alimony award so long as the trial court exercised its discretion within the appropriate legal standards, and ' "supported its decision with adequate findings and conclusions[.]" ' " *Childs v. Childs,* 967 P.2d 942, 946 (Utah Ct.App.1998) (citations omitted), *cert. denied,* No. 981807, 982 P.2d 88 (Feb. 17, 1999). Ms. Thomas concedes the trial court properly considered the factors relevant to the alimony determi-nation, as required by statute. *See* Utah Code Ann. § 30–3–5(7)(a) (1998). Hence, " ' "we will not disturb the trial court's alimony award unless such a serious inequity has resulted as to manifest a clear abuse of discretion." ' " *Childs,* 967 P.2d at 946 (citations omitted).

¶ 13 Ms. Thomas challenges only the duration of the alimony awarded her by the trial court, arguing the court should have awarded her alimony for the maximum statutory period—the length of the marriage. *See* Utah Code Ann. § 30–3–5(7)(h) (1998) (stating that absent extenuating circumstances, alimony may not be ordered for period longer than marriage). The trial court awarded alimony in the amount of $700 per month for three years. Mr. Thomas was awarded credit, however, for alimony paid under the court's Temporary Order during the pendency of the proceedings. As a result, the three-year duration of alimony had actually run before the decree of divorce was entered.

¶ 14 When the decree was entered, Ms. Thomas was thirty-eight years old and in good health. She is a college graduate and has pursued an advanced degree. She maintains steady, full-time employment as a special education teacher, earning $25,824 annually. Her income is supplemented by annual gifts of stocks and bonds from members of her family. The net value of Ms. Thomas's stocks, bonds, and mutual funds in 1993, the year of separation, was in excess of $68,000. From the property settlement, she received her interest in the marital home, nearly $80,000, as well as an equitable share of personal property. Moreover, the court found that Mr. Thomas had only "some" ability to pay alimony.

¶ 15 The trial court's award of temporary alimony appropriately eased Ms. Thomas's transition into her new life. By the time the decree was finally entered, the transition was complete. Although oddly structured as an award of alimony that ended before it began, the trial court appears to have determined that Ms. Thomas had no need of alimony beyond that paid by Mr. Thomas under the temporary support order. In view of Ms. Thomas's age, health, employment, and fi-

nancial resources, this appears to be a case in which no alimony award was warranted. Thus, the trial court did not abuse its discretion when it declined to award additional alimony. *See Rayburn v. Rayburn,* 738 P.2d 238, 241 & n. 6 (Utah Ct.App.1987).

### PROPERTY SETTLEMENT

■ ¶ 16 We now address Ms. Thomas's challenges to the trial court's property division. Her concern centers on the way in which the trial court treated Mr. Thomas's business and the parties' residence.

> We afford the trial court "considerable latitude in adjusting financial and property interests, and its actions are entitled to a presumption of validity." Accordingly, changes will be made in a trial court's property division determination in a divorce action "only if there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error, the evidence clearly preponderated against the findings, or such a serious inequity has resulted as to manifest a clear abuse of discretion."

*Watson v. Watson,* 837 P.2d 1, 5 (Utah App. 1992) (quoting *Naranjo v. Naranjo,* 751 P.2d 1144, 1146 (Utah Ct.App.1988)).

#### 1. Value of Bert Thomas Construction, Inc.

■ ¶ 17 Bert Thomas Construction, Inc. is a construction and maintenance business owned and operated by Mr. Thomas. Ms. Thomas argues that the trial court should have placed a value on the company and then awarded her one-half of that value. She further argues she should be compensated because Mr. Thomas dissipated marital assets when he used sums in a company savings account for his support and for payment of temporary support obligations.

¶ 18 The parties managed the business finances in part by depositing business income into a savings account, then transferring funds to the company checking account or the family checking account as needed. When the parties separated, the company savings account held approximately $40,000. However, by the time the trial court divided the assets, the balance had dwindled to about $7,000. Ms. Thomas urged the trial court to place a value on Bert Thomas Construction, Inc. that would reflect the average balance in the company savings account over time. The court found that the fluctuating balance of the company savings account had no particular bearing on the value of the corporation, and that Ms. Thomas's evidence was therefore insufficient to establish the company's value or to "award [Ms. Thomas] assets [or] assess financial obligations." In essence, Ms. Thomas failed to carry her burden of proof. The trial court therefore did not abuse its discretion in declining to award Ms. Thomas an interest in the corporation. *See Colman v. Colman,* 743 P.2d 782, 789 (Utah Ct.App. 1987).

■ ¶ 19 Ms. Thomas's dissipation of assets argument turns on her contention that Mr. Thomas improperly used business funds, a marital asset, to pay his support obligations and to meet his own needs during the pendency of the divorce proceedings. "[W]here one party has dissipated an asset, hidden its value or otherwise acted obstructively," the trial court may, in the exercise of its equitable powers, value a marital asset at some time other than the time the decree is entered, *Andersen v. Andersen,* 757 P.2d 476, 479 (Utah Ct.App.1988), or may otherwise hold one party accountable to the other for the dissipation of marital assets. *See Jefferies v. Jefferies,* 895 P.2d 835, 838 (Utah Ct. App.1995).

¶ 20 However, in this case the trial court found—and Ms. Thomas's own expert testified—that there was no evidence of "inappropriate expenditures, ... unaccounted for funds, or inappropriate accounting conducted by Mr. Thomas." Nor did the trial court find that Mr. Thomas had improperly benefitted from business proceeds. Indeed, consistent with the parties' historical practices, income from the business was used to pay family expenses. We discern no abuse of discretion by the trial court.[4]

---

4. The trial court's well-founded apprehension about relying on Ms. Thomas's evidence to value

the corporation does not mean the court ignored the evidence. On the contrary, the court recog-

### 2. Interest in the Marital Home

¶ 21  Next, Ms. Thomas argues the trial court erred in awarding Mr. Thomas the value of his premarital interest in the family home.  Mr. Thomas brought to the marriage a home at Sundance that was 35% complete.  About a year and a half after the marriage, title to the home was transferred to both parties jointly.  The home was substantially completed during the marriage, although the evidence showed it remained a work in progress.  During the marriage, Ms. Thomas contributed to the purchase of materials for the home and worked on its construction.  The trial court awarded Mr. Thomas $150,000 of the equity in the home, representing the value of the home at the time of the marriage, and divided equally between Mr. and Ms. Thomas the remainder of the net value of the home as of the time of divorce.

¶ 22  Ms. Thomas argues the trial court should have considered the family home a commingled marital asset.  Generally, " '[e]ach party is presumed to be entitled to all of his or her separate property and fifty percent of the marital property.' "  *Hall v. Hall*, 858 P.2d 1018, 1022 (Utah Ct.App. 1993) (quoting *Burt v. Burt*, 799 P.2d 1166, 1172 (Utah Ct.App.1990)).  However, neither guideline is immutable.  Thus, the separate property of one spouse may be divided if it "has been commingled so that it has lost its separate character, or where it is fair, just and equitable to do [so]."  *Dunn v. Dunn*, 802 P.2d 1314, 1321 (Utah Ct.App.1990).  *See Burke v. Burke*, 733 P.2d 133, 135 (Utah 1987).  Likewise, marital property may be allocated unequally where circumstances "justify departure from the presumptive rule of equal distribution."  *Hall*, 858 P.2d at 1023.

¶ 23  The trial court's findings are ambiguous concerning whether the court considered Mr. Thomas's premarital interest in the home to be his separate property, or whether it regarded the home as marital property that equity required be divided unequally.  Such ambiguity does not, however, require remand for clarification.  Even if, as Ms. Thomas argues, the total value of the home should have been considered a marital asset, the court acted within its equitable powers when it allocated the interest in the marital home as it did:  Exceptional circumstances, memorialized in commendably detailed findings, justified departure from the general rule that each party is entitled to fifty percent of the marital property.  *See id.* at 1022–23.

¶ 24  It is clear from the findings that the trial court endeavored to avoid a property allocation that would force Mr. Thomas to sell the marital home.  The court found that sale of the home would "have a significant adverse effect upon [Mr. Thomas's] employment opportunities" and connections in the Sundance area.  The court emphasized that Mr. Thomas had been established in the Sundance community for many years, and found that it "would prove far more difficult" for him to carry out his business activities if he were forced to sell the home and move from the area.  Further, the court recognized that Ms. Thomas had significant separate assets of her own, and, perhaps most importantly, that selling the family home would disadvantage the children by depriving them of the opportunity to live in their childhood home.

¶ 25  "We recognize the power of the trial court to effect an equitable distribution of property by considering both parties' ... 'circumstances at the time of the divorce.' "  *Id.* at 1023 (quoting *Newmeyer v. Newmeyer*, 745 P.2d 1276, 1278 (Utah 1987)).  The trial court's findings sufficiently support its allocation of the interest in the marital

---

nized that "the actual Bert Thomas Construction Company revenue ... declined sharply [after] separation regardless of the trend of residential construction in Utah County and the previous Bert Thomas Construction trend."  Consistent with *Jefferies*, rather than estimating Mr. Thomas's income at the time the decree was entered, the court estimated Mr. Thomas's income by averaging his 1988 through 1992 income.  *See*

*Jefferies*, 895 P.2d at 838.  We have considered Mr. Thomas's cross-appeal contention that his average income as found by the trial court was inflated and find it to be without merit.  We therefore decline to disturb the trial court's finding on this matter.  *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989); *State v. Payne*, 964 P.2d 327, 332 n. 3 (Utah Ct.App.1998).

home, even if the home is considered marital property.[5]

## CONCLUSION

¶ 26 In sum, we hold, first, that the trial court acted within its discretion in awarding custody of the children to Mr. Thomas, relying primarily on concerns related to Ms. Thomas's relationship with Mr. Sauer. Likewise, the trial court properly exercised its discretion in awarding only temporary alimony to Ms. Thomas. Finally, we decline to disturb the trial court's rulings concerning property division.

¶ 27 Affirmed.

¶ 28 WE CONCUR: MICHAEL J. WILKINS, Presiding Judge, and JAMES Z. DAVIS, Judge.

---

**5.** Ms. Thomas initially argued that Mr. Thomas's expert witness violated Rule 705 of the Utah Rules of Evidence when he testified about the value of Mr. Thomas's premarital interest in the home. Mr. Thomas argued in his brief that this issue had not been preserved for appeal. Ms. Thomas conceded as much in her reply brief. We therefore deem the issue waived. *See Badger v. Brooklyn Canal Co.,* 966 P.2d 844, 847 (Utah 1998).